UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HENRIETTA J. MERCER, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 11-cv-3600 |
| | § | |
| ARBOR E&T, LLC d/b/a RESCARE | § | |
| WORKFORCE SERVICES, and TIM | § | |
| FOLEY, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Defendants Arbor E&T, LLC d/b/a ResCare Workforce

Services ("ResCare") and Tim Foley's Motion for Summary Judgment (Doc. No. 34) and

Motion to Strike Evidence (Doc. No. 56). After considering the motions, all responses thereto,

and the applicable law, the Court finds that Defendants' Motion to Strike Evidence must be

**DENIED**, and their Motion for Summary Judgment must be **GRANTED IN PART** and

**DENIED IN PART**.

## I.      BACKGROUND

Plaintiff Henrietta "Joy" Mercer alleges race, sex, and disability discrimination;

violations of the Family and Medical Leave Act ("FMLA"); retaliation; and assault and battery

against ResCare, her former employer. (3rd Am. Complaint ("Compl."), Doc. No. 28, at ¶ 55-

83.) She also alleges assault and battery against Foley, her former supervisor at ResCare. (*Id.* at

81-83.) Mercer is an African-American woman who claims to suffer from anxiety disorder,

allegedly due to the stressful environment she experienced while employed at ResCare. (*Id.* at ¶¶

2, 66-67.)

ResCare contracts with local workforce development boards for the "management, implementation and delivery of job related services." (Doc. 34-1, at ¶ 3.) From October 1, 2008 to October 31, 2010, ResCare had a contract with Brazos Valley Workforce Solutions ("BVWS"), a local agency responsible for workforce development in the Bryan-College Station, Texas area. (*Id.*) As part of this contract, ResCare operated several offices in the surrounding seven counties. (*Id.*) ResCare hired Mercer as an Operations Manager at the Brazos Valley office. (Compl. ¶ 11.) Although Mercer's employment with ResCare began on October 1, 2008—the beginning of ResCare's contract with BVWS—she had been continuously employed by BVWS's prior contractors since 1999, including an unspecified amount of time in the position of Operations Manager. (Doc. No. 41-2, at ¶¶ 3, 6, 8.)

The staff in the BVWS offices was very racially diverse, with many African-American and Hispanic employees. (Doc. No. 41-2, at ¶ 11.) It appears, however, that this racial diversity did not extend to the upper management. According to Mercer, she was the only African-American manager at ResCare. (Doc. No. 41-2, at ¶ 9.)

Mercer's and Defendants' accounts of her employment at ResCare differ dramatically. For purposes of this recitation of facts, the Court will focus on Mercer's allegations, where supported by competent evidence. Most of these allegations are disputed by Defendants. A few of the most salient disagreements are noted below.

### A.    Alleged discrimination by ResCare managers

Mercer reports observing significant racial animus between management and staff during her time with ResCare.  Mercer claims to have been a witness in a June 2009 race discrimination complaint filed by an African-American female, Chloe Taylor, against then-Interim Project Director Harold Womble, who is Caucasian. (Doc. No. 41-2, at ¶ 10.) According to Mercer, she

personally observed, and confirmed to investigators, "racial mistreatment by Womble towards Taylor."[1] (*Id.*)

Shortly thereafter, Womble left the Brazos Valley location and was replaced by Defendant Foley as Project Director. (Doc. No. 41-2, at ¶ 11.) Foley, like Womble, is Caucasian. (*Id.*) Mercer claims that, shortly after Foley's arrival at the Brazos Valley office in July or August 2009, he told her that she had "too many staff that look like you." (*Id.*) Mercer interpreted this comment to refer to the fact that her staff was primarily African-American and Hispanic. (*Id.*)  Mercer also claims that Foley directly criticized her involvement in Taylor's race discrimination complaint against Womble, telling her that she should not have confirmed Womble's discriminatory behavior. (*Id.*) Finally, according to Mercer, Foley indicated that he wanted to make some changes at BVWS, including to two positions held by minority employees: Dora Lopez (Hispanic) and Latresia Williams (African-American.) (*Id.*) Lopez was a Senior Operations Supervisor, responsible for overseeing operations in Leon, Burleson, and Robertson Counties, along with half of Brazos County. (Doc. No. 39-3, at ¶¶ 9, 12.) Williams was an Operations Supervisor, responsible for overseeing operations in Madison, Grimes, and Washington Counties and the other half of Brazos County. (*Id.* at ¶¶ 9, 12.) Foley allegedly asked Mercer to "write up" Lopez and Williams for purposes of creating a disciplinary record, which she refused on the grounds that no write-up was justified.[2] (Doc. No. 41-2, at ¶ 12.)

At a management meeting in September 2009 attended by Mercer, Foley announced a restructuring at the Brazos Valley office. (Compl. ¶ 18.) Mercer claims that this restructuring involved the purported "elimination" of Lopez's and Williams's positions, and the transition of

---

[1] Mercer does not specify the nature of this "racial mistreatment."

[2] In his deposition, Foley admitted asking Mercer to "write up" Lopez and Williams. (Doc. No. 60-1, at 2-3.)

those employees to new positions as of October 1, 2009.[3]   (Doc. No. 41-2, at ¶ 13.) Mercer disputes that either Lopez's position or Williams's position was eliminated. (*Id.* ¶¶ 14-15, 17.) She states that Carin Shuford, a Caucasian female, assumed Lopez's former position. (*Id.* ¶¶ 14-15.) Defendant Foley's testimony suggests that Shuford may have assumed Williams's position as well. (Doc. No. 44-3, at 2.) Both Williams and Lopez lost their personal office space due to the reorganization and were assigned to cubicles. (Doc. No. 39-3, at ¶¶ 12-13; Doc. No. 44-3, at 2.) Shuford was allegedly given Lopez's former office. (Doc. No. 39-4, at ¶ 11.)

At or around this time, Sonny Musick, a Caucasian male, began working at the Brazos Valley office as Resource Coordinator. (Compl. ¶ 21.) Mercer claims that he was recruited by Foley, and a position was created specially for him. (Doc. No. 41-2, at ¶ 16.) Musick allegedly moved into Mercer's office, which required Mercer to move into an inferior office space although she was higher in the organizational structure. (Doc. No. 39-4, at ¶ 16.)

In addition to Musick, Mercer alleges that Foley also recruited Cynthia Belt, a Caucasian female, to work at the Brazos Valley office. (Doc. No. 41-2, at ¶ 16.) She was allegedly given the youth caseworker position previously occupied by Marshall Robinson, an African-American female, who was reassigned by Foley.[4] (*Id.* ¶ 17; Doc. No. 41-3, at ¶ 17.)

In October 2009, Mercer was allegedly informed of a discrimination claim by employee Kenneth Sargeon, an African-American male, against Foley and Sargeon's direct supervisor, Dani Hardison, a Caucasian female. (Doc. No. 41-3, at ¶ 19.) This complaint was purportedly made known to the Texas Workforce Commission ("TWC") HR Director Steve Rye, other TWC

---

[3] Defendants admit that Williams was reassigned in this time period. (Doc. No. 29, at ¶ 19; Doc. No. 30, at ¶ 19.)

[4] Defendants admit that Robinson was reassigned in this time period. (Doc. No. 29, at ¶ 19; Doc. No. 30, at ¶ 19.)

staff, and the board of BVWS. (*Id.*) Sargeon allegedly believed that he was the victim of age "or some other" discrimination when he was demoted from greeting customers at the front of the Brazos Valley office to an administrative assistant position and given unrealistic job expectations. (*Id.*; Doc. No. 46-2, at 2.) Mercer claims that Foley told her, "[Sargeon's] going to get out of here. I want him gone. He is too black, ugly and ghetto [to] work up front." (Doc. No. 41-3, at ¶ 19.)

According to Mercer, all of these organizational changes in the fall of 2009 reduced the visibility of minority employees at the Brazos Valley worksite. Once a fixture in the office, many of these employees were "now traveling back and forth to the various different counties." (Doc. No. 41-3, at ¶ 18.)

Mercer also reports a March 2010 race discrimination claim by employee Najuma Cunningham, an African-American female, against Lauretta Payne, a Caucasian female. (Doc. No. 41-3, at ¶ 22.) According to Mercer, Payne admitted telling Cunningham that her sister had "several strikes against her: she was (i) fat, (ii) black, (iii) diabetic, and (iv) female." (*Id.*) The following month, Cunningham was nominated "Employee of the Month" by her peers. (*Id.* ¶ 23.) Mercer claims that Foley—with whom she had discussed Cunningham's race discrimination claim against Payne—refused to support Cunningham's nomination. (*Id.*) He purportedly told Mercer that Cunningham would not be employed with ResCare much longer because of her "loose lips." (*Id.*) This was the only occasion that Mercer can recall Foley having any opinion regarding the "Employee of the Month." (*Id.*)

Mercer's reports of racial animus are corroborated by other witnesses. TWC employee Derick Clark—who worked at the Brazos Valley worksite with Mercer—claims that Foley "openly stated that Sargeon was 'too black and too ugly' to work in [an area where he greeted

5

clients]." (Doc. No. 39-1, at ¶ 7.) Clark also reports that Foley asked Mercer during a management meeting if she knew "Ebonics" and then told her to "[g]o ahead and talk to these people." (*Id*. ¶ 8.) Shirley Harris, a former Unemployment Insurance Representative, reports that minority employees were strictly policed on their work breaks, while Caucasian employees were not; that minority employees were scolded for entering the office through the front door, while Caucasian employees were not; and that minority employees were reprimanded for engaging in small talk, while Caucasian employees were not. (Doc. No. 39-2, at ¶¶ 4-5, 8-9.)

### B.    Mercer's complaints of discrimination

Mercer first verbally voiced her concerns about Foley to his supervisor, Kenneth Carlson, who is Caucasian. (Doc. No. 41-3, at ¶ 21.) She allegedly told Carlson that she was highly offended by racial comments made by Foley, including the statement that Sargeon was "too black, ugly and ghetto" for the front office. (*Id*.) She also complained that Caucasian employees were replacing minority employees with no performance deficiencies, and that Foley had asked her to create unjustified disciplinary records against Williams and Lopez. (*Id*.) Mercer does not specify when these conversations with Carlson took place.

Mercer lodged a formal complaint of discrimination against Foley with Divisional Director of Human Resources Sherry Dawson on April 8, 2010. (Doc. No. 41-3, at ¶ 24.) Mercer complained of a "hostile workplace environment" and stated that she had been "treated . . . adversely because of [her] gender, age and race." (*Id*.) According to Mercer, Foley learned of the complaint and "flew into a rage" in Mercer's office. (*Id*.) Mercer claims that he thereafter insisted that Mercer hand-deliver all reports to him instead of e-mailing them, and that he would use these occasions as an opportunity to "intimidate" and "bully" Mercer in person. (*Id*.)

Dawson hosted a meeting on Mercer's complaint on April 22, 2010. (Doc. No. 41-3, at ¶ 25.) It was attended by Dawson, Carlson, Foley, and Mercer. (*Id*.) According to Mercer, she joined the meeting after the other three participants had been speaking behind closed doors for approximately an hour. (*Id*.) She claims that, once she joined, Dawson opened with, "The [BVWS] Board and [ResCare] are very happy with [Foley] and he is not going anywhere." (*Id*.) Dawson then allegedly accused Mercer of gossiping at work. (*Id*.) When Mercer complained about Foley's "aggressive behavior, threats and tirades," Dawson allegedly asked Foley to refrain from yelling at Mercer. Mercer claims that he responded by leaning across the table towards Mercer and screaming at her, "No, I cannot say I will stop yelling at you!" (*Id*.) Mercer claims that she feared Foley would strike her. (*Id*.) Dawson then purportedly told Foley and Mercer to work up an agreed plan, which caused Mercer to suffer a panic attack that required "fresh air." (*Id*.) The meeting broke. While outside, Mercer claims to have seen Dawson and Foley get into a car together and leave. (*Id*.) She states that she "never trusted human resources again." (*Id*.)

On May 11, 2010, Mercer received a Mid-Year Evaluation in which Foley called her job performance "satisfactory." (Doc. No. 41-3, at ¶ 26.) The evaluation was apparently administered in person between Foley and Mercer. (*Id*.) Mercer claims that, during this meeting, Foley insisted that she sign a response to her discrimination claim against him, which she refused. (*Id*.) She states that he reacted with anger but then said that it did not matter if she signed because "he had something planned for me." (*Id*.)

## C.     Mercer's physical decline and medical leave

Mercer claims that the environment at ResCare caused her to deteriorate, physically and psychologically. She reports going to the hospital with chest pains after one encounter with

Foley. (Doc. No. 41-3, at ¶ 20.) On another occasion, she allegedly suffered an "eruption" of blood vessels in one eye. (*Id.*) As mentioned above, she claims to have suffered a panic attack during the April 22, 2010 meeting on her discrimination complaint against Foley. (*Id.* ¶ 25.) Finally, on May 12, 2010, her doctor advised her to take medical leave from work. (*Id.* ¶ 27.)

Mercer claims that when she told Foley that she needed to take medical leave, he refused to allow her to begin the leave immediately, insisting that she first finish a newly assigned project. (Doc. No. 41-3, at ¶ 27.) Mercer does not specify how long this project took to finish, but Defendants state that her medical leave commenced on May 13, 2010. (Doc. No. 34-1, at ¶ 8.) This appears to be one or two days after the leave was requested. Mercer claims that Foley insisted that she continue to do work from home during her leave. (Doc. No. 41-3, at ¶ 27.)

Mercer also accuses Foley of making her return to work unnecessarily difficult. She claims that he did not show for a scheduled meeting with her on July 26, 2010 to discuss her return. (Doc. No. 41-3, at ¶ 28.) He also allegedly required her to be cleared for return to work by the same physician who advised her to take leave, even though this physician was out of the country and the physician's medical partner was willing to release Mercer. (*Id.* ¶ 29.) Because she could not procure the required clearance before her twelve weeks of permitted FMLA leave expired, she asked for and received another seven days of general leave from Foley. (*Id.* ¶ 29.)

### D. Mercer's return, demotion, and lay-off

Mercer returned to ResCare on August 12, 2010. (Doc. No. 41-4, at ¶ 30.) She reports that her office was filled with boxes and that her personal belongings had been removed or replaced. (Doc. No. 41-4, at ¶ 30; Doc. No. 54-2, at 2-3.) She allegedly continued performing the duties of Operations Manager, as before her leave. (Compl. ¶ 53; Doc. No. 41-4, at ¶ 41.) But internal emails suggest that ResCare management and human resources personnel were already

discussing that Mercer would not be restored to Operations Manager. (Doc. No. 54-5, at 2 ("[N]ot sure you are aware of who [Mercer] is . . .  She is the lady who came back from FML and because of prior performance issue was not going to be returned to her previous job."); Doc. No. 55-4, at 3-4, 6.) The position had been posted as available during her absence, and ResCare began accepting applications on or around Mercer's return. (Doc. No. 34-1, at ¶ 10; Doc. No. 55-4, at 3-4.)

Defendants claim that Mercer's position was posted during her one week of general leave—not her FMLA leave—because ResCare needed someone to perform the duties of Operations Manager and because those duties needed to include supervision of *all* departments, including Business Services. (Doc. No. 34-1, at ¶ 10.) According to Foley, he removed supervision of the Business Services unit from Mercer's job responsibilities after arriving at the Brazos Valley worksite, because he realized that Mercer was not "comfortable" or capable of supervising that department. (*Id.* at ¶¶ 6-7.) Mercer disputes that she was ever responsible for supervising Business Services, or that Foley removed this job responsibility from her. (Doc. No. 41-2, at ¶ 7.) According to Mercer, Business Services historically had been supervised by the Project Manager—i.e., Foley and his predecessors—because it required supervision of state employees, with corresponding training and involvement in state procedures, which a contract employee such as Mercer was not qualified to do. (*Id.*) She states that the only contract employee with necessary access to state systems was the Project Director. (*Id.*)

ResCare also posted an opening for Rural County Supervisor on or around the date of Mercer's return. (*Id.* ¶ 11.) Mercer claims that Foley immediately began pressuring her to apply for and accept the open Rural County Supervisor position, which represented a demotion and a pay cut from the Operations Manager position. This campaign allegedly began on August 19,

9

when Foley called to ask if Mercer had applied for Rural County Supervisor. (Doc. No. 41-4, at ¶ 32.) Mercer responded that she did not intend to apply for that position because she wished to remain Operations Manager. (*Id*.) Foley then purportedly said, "I guess you do not want a job!" (*Id*.) Mercer also claims that Foley visited her office later that day and screamed, "I need you to apply for that job now!" (*Id*.) Mercer states that she relented in response to Foley's pressure and applied for Rural County Supervisor. (*Id*.)

Mercer also applied for Operations Manager, the position she then occupied. (Doc. No. 41-4, at ¶ 32.) She claims that Foley came to her office on August 20 and asked her, "Why did you apply for the Operations Manager position when I told you [Musick] is getting that job?" (*Id*. ¶ 33.)

Mercer alleges that none of the typical hiring processes was followed for the Operations Manager and Rural County Supervisor positions. She says she was not interviewed for either position. (Doc. No. 41-4, at ¶ 34.) Instead, on September 2, Foley allegedly came to her office and demanded that she write a letter stating that she wanted to be demoted to Rural County Supervisor and receive a pay cut of $1.21 per hour.[5] (*Id*. ¶ 35.) According to Mercer, Foley gave her exactly what he wanted her to put in this letter. (*Id*.; Doc. No. 54-4, at 3.) She claims that she obliged because she was afraid of Foley and afraid of losing her job.[6] (Doc. No. 41-4, at ¶ 34.)

---

[5] Internal emails suggest that Foley's request was prompted by Kris McGill, ResCare's human resources director, who stated on September 2 that she would approve Mercer's demotion if Mercer had consented in writing. (Doc. No. 54-5, at 2.) Foley first submitted the demotion for approval on August 26. (Doc. No. 55-4, at 2.)

[6] Although Mercer at one point states that she "obliged" Foley's request to write a letter requesting a demotion, she later states that she wrote to Foley on September 3 that she was "uncomfortable adding the wording [Foley] suggested because a demotion reflects that I or you felt that I could not do my job." (Doc. No. 41-4, at ¶ 36.) Neither side has submitted this alleged correspondence, nor any document from Mercer in which she accepted the demotion and pay cut as required for human resources approval.

Mercer claims that Foley announced her demotion at a manager's meeting on September 7, 2010—the same meeting at which he announced that Musick would be the new Operations Manager. (Doc. No. 41-4, at ¶ 37.) As part of her new position, Mercer was required to travel to satellite offices many days of the week. (*Id.*) Therefore, Foley required Mercer to move her belongings from her office to a cubicle. (*Id.* ¶ 38.) Mercer requested to remain in an office— possibly sharing it with another employee—since all of the other supervisors had an office. (*Id.*) She reports that he denied her request, stating, "I want you out of that office and in a cubicle where you belong!" (*Id.*) Foley admits that he did not permit Mercer to remain in her office, which he wanted to remain open and available for the incoming Operations Manager.[7] (Doc. No. 45-4, at 4.)

At some point, Mercer was presented with an offer letter of employment for the Rural County Supervisor position, which she was required to sign. (Doc. No. 41-4, at ¶ 39; Doc. No. 29, at ¶ 47; Doc. No. 30, at ¶ 47.) On that same day, Foley allegedly accused Mercer of contacting Rye—the human resources director for the TWC—about him and threatened her job: "I will terminate you immediately if I find out that you have talked to the [BVWS] Board or [Rye] about me. I am good at planting stones for people. . . . You people think you can get by with messing with me but I haven't lost a battle yet!" (Doc. No. 41-4, at ¶ 40.) Mercer claims that she reported this threat to the Bryan police department. (*Id.*)

On September 23, 2010, a staff meeting was called at the Brazos Valley office for all ResCare and TWC employees. It was announced that the BVWS Board had "pulled" the ResCare contract, and that ResCare would be replaced by another contractor. (Doc. No. 41-4, at ¶ 43.) Mercer claims that multiple individuals at the meeting—specifically, Foley, Carlson, and

---

[7] Foley testified that the hiring for the Operations Manager position was not finalized before the end of the ResCare contract. (Doc. No. 45-4, at 4.)

several other executives from ResCare and the BVWS Board—reassured the ResCare staff that "nobody had to worry about their jobs." (*Id.*) She claims that these individuals explained how entering contractors picked up the employees of the exiting contractor and gave Mercer and Lopez as examples of employees who had been employed continuously by multiple contractors. (*Id.*) Defendants dispute that any reassurances of continued employment were given at this meeting. (*Id.*)

The following day, Mercer was laid off in a meeting with Musick and Michael Root, who had recently been hired as temporary Special Projects Coordinator. (Doc. No. 41-4, at ¶¶ 37, 44.) When Mercer questioned why she was being laid off, Musick responded that the decision was based on seniority, performance, and need. (*Id.* ¶ 44.) Mercer was one of nine ResCare employees terminated in September 2010. (Doc. No. 34-2, at ¶ 6.) According to Foley and Kris McGill, ResCare's Human Resources Director, these lay-offs were necessitated by funding constraints at BVWS. (Doc. No. 34-1, at ¶ 13; Doc. No. 34-2, at ¶ 6.) To address these constraints, BVWS decided to reduce the hours of operations at four of its locations and merge the locations' staff. (Doc. No. 34-1, at ¶ 13.) Foley claims that he learned about BVWS's funding issues in mid-September, after Mercer had been demoted. (*Id.*) He acknowledges that ResCare was given discretion which employees to terminate. (*Id.*) Although Foley claims not to recall if he played a role in assembling the list of recommended lay-offs (*id.*), he testified at his deposition that he, Musick, Root, and possibly others composed the list (Doc. No. 34-5, at 3-5.) McGill reports receiving the list of proposed terminations from Foley and approving it pursuant to ResCare's non-discrimination policy. (Doc. No. 34-2, at ¶ 4.)

Mercer claims that being told of her firing prompted a panic attack, including "uncontrollable tears, high anxiety, light headedness, loss of speech and severe breathlessness."

(Doc. No. 41-4, at ¶ 45.) She reports that she left the room where her meeting with Musick and Root had taken place, and fell down about ten feet away. (*Id*.) Her coworkers allegedly gathered around her, crying. (*Id*.) She says she was taken by ambulance to a local hospital. (*Id*.)

ResCare's contract with BVWS ended on October 31, 2010. (Doc. No. 34-2, at ¶ 9.) All remaining ResCare employees at the BVWS worksites ceased to be employed by ResCare at that time. (*Id*.) Mercer contends that, historically, most or all of the employees of the outgoing contractor are simply picked up by the incoming contractor; deposition testimony and affidavits from her former co-workers support that this actually happened following the expiration of the ResCare contract.[8] According to Lopez, who allegedly attended meetings regarding ResCare's budget, ResCare had money remaining in the operations budget at the time that the BVWS contract expired. (Doc. No. 39-4, at ¶ 25.)

## II.    LEGAL STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).

---

[8] Specifically, Nyosha Boone testified that she applied to the incoming contractor, Pinnacle; interviewed with Pinnacle; and was hired to continue in the same position at BVWS by Pinnacle. (Doc. No. 50-1, at 4.) Lopez and Williams were also employed by Pinnacle following the expiration of ResCare's contract with BVWS. (Doc. No. 50-2, at 3; Doc. No. 39-3, at ¶ 4; Doc. No. 39-4, at ¶ 4.)

The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Crawford*, 234 F.3d at 902. The Court may not make credibility determinations or weigh the evidence. *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. FED. R. CIV. P. 56(c); *see, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.   ANALYSIS

### A.   Discrimination Claims under Title VII

Under Title VII of the Civil Rights Act of 1964 ("Title VII"), it is unlawful for an employer to discriminate against an employee based on the individual's race or sex. *See* 42 U.S.C. § 2000e-2(a). Intentional discrimination can be proven by either direct or circumstantial evidence. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). If the plaintiff lacks direct evidence of discrimination, her claims may be analyzed according to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id*. at 802. To meet this burden, the plaintiff must show: (1) she is a member of a protected class; (2) she was qualified for the job; (3) she suffered an adverse employment action; and (4) she was replaced with a person outside the protected class, or was

treated less favorably than others, similarly situated, who are outside the protected class.[9] *Jones v. Overnite Transp. Co.*, 212 Fed. Appx. 268, 273 (5th Cir. 2006). If the plaintiff succeeds in making the *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the treatment of the plaintiff. *Id*. If the defendant offers such a reason, the burden shifts back to the plaintiff to show that the employer's reason for the disparate treatment is merely a pretext for discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)); *see also Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002) (finding that an employer's inconsistent explanations for its employment decisions at different times may permit a jury to infer that the proffered reasons are pretextual).

### 1.    Prima facie case

Mercer experienced two adverse employment events in the fall of 2010. First, she was demoted from Operations Manager to Rural County Supervisor effective August 24. Second, she was laid off from the Rural County Supervisor position effective September 30. ResCare contends that Mercer cannot make out a prima facie case of discrimination for either of these events.

---

[9] In reduction in force cases, or other situations in which a plaintiff's treatment is not immediately comparable to another employee, this final element of the prima facie case can be met by "'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'" *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 576 (5th Cir. 2003) (quoting *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996)).

### a.      Demotion to Rural County Supervisor

As to Mercer's demotion, ResCare argues that she cannot establish the required elements that: (1) she was qualified for the Operations Manager position and (2) she was *involuntarily* subject to an adverse employment decision. Relying upon the affidavit of Foley, ResCare claims that Mercer's alleged inability to supervise the Business Services unit rendered her unsuitable for the Operations Manager position. (Doc. No. 34, at 9-10.) ResCare also claims that Mercer recognized that she was unqualified and chose to move to a position with lesser responsibility and lesser pay, negating that she was "subject" to an adverse employment decision made by ResCare. (*Id*.)

ResCare's first argument is foreclosed by Fifth Circuit law. The Fifth Circuit has stated that the qualification element of the prima facie case is limited to objective, verifiable qualifications such as licensure or certification:

> [A] plaintiff challenging his termination or demotion can ordinarily establish a prima facie case of . . . discrimination by showing that he continued to possess the necessary qualifications for his job at the time of the adverse action.
>
> By this we mean that plaintiff had not suffered physical disability or loss of a necessary professional license or some other occurrence that rendered him unfit for the position for which he was hired.

*Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1506 & n.3 (5th Cir. 1988). This rule was established to "simplify application of the *McDonnell Douglas* paradigm in the context of termination and demotion cases." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 350 (5th Cir. 2007). Even if this were not the case, however, Mercer has provided ample conflicting evidence showing a genuine issue of material fact regarding whether the Operations Manager ever had responsibility for supervising Business Services. (Doc. No. 41-2, at ¶ 7; Doc. No. 39-3, at ¶ 26; Doc. No. 39-4, at ¶ 24.)

Similarly, Mercer has demonstrated a genuine issue of material fact regarding the "voluntariness" of her demotion. She claims that she was pressured into the demotion—and badgered into putting her acceptance of the demotion in writing—by Foley. (Doc. No. 41-4, at ¶¶ 32, 34.) Her version of events is substantiated by an internal email dated August 13—the same week Mercer returned to work—in which McGill noted that Mercer had complained to ResCare's FML department about her demotion and pay cut. (Doc. No. 55-4, at 6.) A subsequent email from McGill stated that "Mercer has been challenging her demotion since she returned from FML." (Doc. No. 55-6, at 2.)

Mercer has provided competent summary judgment evidence that she was qualified for the Operations Manager position and that she was forced into accepting a lesser role at ResCare. This is sufficient for a jury to find that Mercer has established a prima facie case of discrimination.

### b. Lay-off from Rural County Supervisor

ResCare also contends that Mercer has not provided evidence sufficient to allow a jury to reasonably conclude that ResCare "'intended to discriminate'" when it laid her off due to forced budget cuts by ResCare's funding source, BVWS. (Doc. No. 34, at 17.) The Court disagrees. As described above, Mercer has provided affidavits and deposition testimony alleging numerous instances of Foley using racially charged, derogatory language and taking adverse action against minority employees. Mercer filed a formal complaint against him for some of these instances, which she believed created a hostile work environment. (Doc. No. 41-3, at ¶ 24.) An email written by Carlson indicates that, shortly after Mercer's complaint—separated only by the length of Mercer's FMLA leave—Foley began "trying to take personnel action" against Mercer for

undocumented performance issues.[10] (Doc. No. 52-1, at 3.) This evidence is sufficient to raise an issue of fact regarding whether Foley was motivated by discriminatory animus when he added Mercer's name to the list of employees proposed to be terminated.

### 2.    Legitimate, nondiscriminatory reasons

Because Mercer has provided evidence to support a prima facie case of discrimination, the burden shifts to ResCare to "produc[e] evidence that [Mercer] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Because Mercer suffered two adverse employment decisions—her demotion to Rural County Supervisor and her subsequent lay-off as Rural County Supervisor—ResCare must identify legitimate, nondiscriminatory reasons for both decisions.

ResCare has met its burden.[11] ResCare claims that Mercer was incapable of supervising Business Services; that supervising Business Services was previously part of the Operations Manager's job responsibilities; and that ResCare decided in August 2010 that Business Services needed to be moved back under the Operations Manager's purview. (Doc. No. 34-1, at ¶ 10.) This constitutes a legitimate, nondiscriminatory reason for Mercer's demotion to Rural County Supervisor.

ResCare has also provided evidence that BVWS required ResCare to reduce hours of operations at certain county offices and lay-off redundant staff. (Doc. No. 34-1, at ¶ 13.) ResCare

---

[10] Carlson's email indicates that he believes the lack of documentation to be due to Foley's poor record-keeping, and not to the absence of any issues in Mercer's job performance. (Doc. No. 52-1, at 3.)

[11] Although the *McDonnell Douglas* framework is described as "burden shifting," the Court notes that ResCare's burden is one of production, not persuasion. *Burdine*, 450 U.S. at 253-56. The burden of persuasion for Mercer's claims rests solely on Mercer. The credibility of Defendants' legitimate, nondiscriminatory reasons is properly addressed in the final stage of the framework, in which Mercer may show that the reasons were pretextual.

claims that Mercer's Rural County Supervisor position was one of many positions no longer needed after the reduction in operations. (*Id.*) A reduction in force required by changed financial conditions constitutes a legitimate, nondiscriminatory reason for Mercer's lay-off.

### 3.     Pretext

Because ResCare has articulated legitimate, nondiscriminatory reasons for Mercer's demotion and lay-off, the burden shifts back to her to demonstrate that these reasons were pretextual. Mercer has demonstrated a factual dispute regarding pretext.

#### a.     Demotion

Mercer disputes that she ever had responsibility for Business Services, contradicting Foley's testimony that he took this responsibility away from her in order to accommodate her. (Doc. No. 41-2, at ¶ 7.) Two former coworkers—Williams and Lopez—corroborate her testimony. (Doc. No. 39-3, at ¶ 26; Doc. No. 39-4, at ¶ 24.) She also disputes that it would have been appropriate for the Operations Manager to supervise Business Services, because that unit involved a mixture of ResCare and TWC (i.e., state) employees and needed to be supervised by an employee with access to state systems, which she did not have. (Doc. No. 41-2, at ¶ 7.) This is sufficient to create a triable issue as to whether ResCare's articulated reason for demoting Mercer is true. *See Laxton*, 333 F.3d at 578.

#### b.     Lay-off

Mercer has also demonstrated a genuine issue of material fact regarding whether her Rural County Supervisor position was eliminated in September 2010 due to BVWS's budget cuts and lack of need. She testifies that, even after several county offices reduced hours and merged staff in September 2010, all county offices remained open. (Doc. No. 41-5, at ¶ 46; Doc. No. 39-3, at ¶ 24.) Mercer contends that these county offices still needed supervision, contradicting any

19

argument that her position of Rural County Supervisor was eliminated for lack of "need." (*Id.*) Mercer also submits the affidavit of Lopez, who states that ResCare still had money left in the operating budget at the time of the expiration of its contract with BVWS. (Doc. No. 39-4, at ¶ 25.) Mercer argues that this budgetary cushion belies ResCare's claim that her position was eliminated for lack of funds.

### c. Other evidence of pretext

The evidence of pretext is not limited to the specific rebuttals recounted above. Candidly, Defendants appear to have had some difficulty getting their stories straight regarding the events following Mercer's return to work. At times, they insist that Mercer's demotion was entirely voluntary, driven by her independent desire to be in a position with reduced responsibilities. (Doc. No. 57, at 5.) Elsewhere, they suggest that the demotion was orchestrated by ResCare due to a legitimate business need to replace Mercer with someone who possessed a deeper skill set. (Doc. No. 34, at 9-10.) The contemporaneous business records reflect a similar state of confusion. Emails from Foley and Carlson describe the demotion as Mercer's choice. (Doc. No. 55-4, at 2; Doc. No. 57-1, at 29.) Meanwhile, emails from human resources representatives detail how Mercer challenged her demotion throughout August and September 2010. (Doc. No. 55-4, at 6; Doc. No. 55-6, at 2.) These emails suggest that the demotion was rubber-stamped by human resources only out of a mistaken belief that the demotion had been in the works prior to Mercer's FMLA leave as a result of a corrective action against her. (Doc. No. 55-4, at 6.) The inconsistency of Defendants' own competing versions of events is itself evidence of pretext. *See Nichols v. Lewis Grocer*, 138 F.3d 563, 568 (5th Cir. 1998).

Pretext is further supported by the admitted procedural irregularities of Mercer's demotion and lay-off. *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 404 n.8 (5th Cir.

2001) (acknowledging that failure to follow internal procedures when terminating an employee can be evidence of pretext). ResCare's procedures required Mercer's demotion to be approved by human resources. Carlson and Foley failed to request this approval before submitting the demotion to payroll. (Doc. No. 54-5, at 2-3.) Likewise, ResCare's procedures required the proposed terminations in September 2010 to be pre-approved by human resources prior to their enactment. But human resources received the list of proposed lay-offs *after* the affected employees—including Mercer—had been informed of their termination. (Doc. No. 57-1, at 17-20.) As a result of this inversion of the typical process, McGill described Mercer's termination as not completely "clean." (*Id.* at 19-20.) ResCare seeks to minimize the impact of McGill's admission, but it cannot be ignored on summary judgment. Procedural irregularities may be meaningless; or they may be the hallmarks of a rushed, careless, and unchecked campaign against an employee for illegitimate reasons. Which of these characterizations should be applied to Carlson's and Foley's actions is properly decided by a jury, not by the Court.

### B.    Americans with Disabilities Act

The Americans with Disabilities Act ("ADA") prohibits discrimination by private employers against qualified individuals on the basis of disability. 42 U.S.C. § 12112(a). The current version of the ADA incorporates the ADA Amendments Act of 2008 (the "ADAAA"). Because the events at issue in this case occurred after January 1, 2009, the effective date of the ADAAA, the Court looks to post-amendment language in considering Mercer's claims.

Like Title VII discrimination claims, ADA claims are subject to the *McDonnell Douglas* burden-shifting framework. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003.) Pursuant to this framework, the Court will address whether Mercer has provided evidence

to support a prima facie case;[12] whether ResCare has articulated a legitimate, nondiscriminatory reason for its action; and whether Mercer has provided evidence that the reason given was merely a pretext for disability discrimination.

### 1.    Prima facie case

#### a.    Disability

ResCare urges that Mercer cannot set forth a prima facie case of disability discrimination because she does not meet the definition of disabled under the ADA. (Doc. No. 34, at 11-13.) The ADA defines the term "disability" in three, alternative ways. It is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The ADAAA expanded the definition of "major life activities" to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 122 Stat. 3553, sec. 4 § 2(A); 42 U.S.C. § 12102(2)(A). The limitation that the impairment places on a major life activity must be "substantial." To be substantial, an impairment must limit the ability of an individual to perform a major life activity as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii); *see also Holland v. Shinseki*, Civ. Act. No. 3:10-cv-0908-B, 2012 WL 162333, *6 (N.D. Tex. Jan. 18, 2012). This standard is to be "construed broadly in favor of expansive coverage." 29 C.F.R. § 1630.2(j)(1)(i).

Mercer offers her own testimony to prove the existence of a disability under the first prong of 42 U.S.C. § 12102(1). She states that she suffers from "memory loss, difficulty

---

[12] A prima facie case of disability discrimination consists of evidence that: (1) plaintiff is disabled or regarded as disabled; (2) she was qualified for the position; (3) an adverse employment action was taken against her; and (4) she was replaced by or treated less favorably than non-disabled employees. *Gowesky*, 321 F.3d at 511.

concentrating, extreme weight loss, limitations in speaking, hair loss to the point of my having to wear wigs, blurred vision, inability to stand or walk, difficulty breathing, chest pains, and inability to care for myself and complete household duties." (Doc. No. 41-5, at ¶ 48.) ResCare counters that she has not shown that she was substantially limited in a major life activity. ResCare's argument is based on two suppositions, neither of which accurately reflects the law or the evidence.

First, ResCare argues that Mercer's alleged disability was not sufficiently permanent or long-term because Mercer was cleared to return to work by her physician after only a month of leave.[13] (Doc. No. 34, at 11.) But Mercer's ability to return to work does not establish that she no longer suffered from a disability. The very existence of the ADA recognizes that a disability and gainful employment are not mutually exclusive.

Second, ResCare cites the following deposition testimony from Mercer as an admission that she was not substantially limited in any major life activity:

> Q:    Because of your disabilities that you had, was there anything that you could not do when you were employed by [ResCare]?
>
> A:    When I was out on Family Medical Leave?
>
> Q:    No, whenever you were still working there.
>
> A:    When I was still working there? It just took me longer to get things done, more concentration.

(Doc. No. 34, at 12.) Viewing this testimony in the light most favorable to Mercer, the Court does not consider it an admission that she was not substantially limited in any major life activity. It appears that Mercer was limiting her response to how her disability affected her job

---

[13] The Court notes that this appears to be an error within Defendants' brief, as the parties otherwise appear to agree that Mercer was on FMLA leave for the full 12 weeks authorized by law.

performance at ResCare. But the proper focus in determining whether an individual is disabled under the ADA is "whether [she] is unable to perform the variety of tasks central to most people's daily lives, not whether [she] is unable to perform the tasks associated with her specific job." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 200-01 (2002). Thus, Mercer's affidavit properly sets out several additional limitations to major life activities in her personal life, such as speaking, standing, walking, breathing, caring for herself, and completing household duties. (Doc. No. 41-5, at ¶ 48.)

Moreover, even if the Court confined its analysis to Mercer's deposition testimony alone, she stated that she suffered from decreased concentration. The Court finds this testimony adequate to demonstrate a genuine issue of material fact regarding whether Mercer is disabled. "Concentrating" is included in the ADA's definition of major life activities. 42 U.S.C. § 12102(2)(A). The post-ADAAA regulations make clear that "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(v). The regulations also provide that, after the passage of the ADAAA, the consideration of the "substantially limits" prong is not the primary object of attention in ADA cases, and "should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(iii). In light of the "substantially limits" standard created by the ADAAA, the Court thinks it appropriate to read Mercer's testimony as giving rise to a genuine issue of material fact as to whether her difficulty concentrating is unique, and unlike those experienced by the general population. Thus, the Court finds that the evidence creates a factual question about whether Mercer has a disability under the ADA.

### b.      Causal connection

ResCare also argues that Mercer has not established her prima facie case because she cannot establish that the adverse employment actions taken against her had anything to do with her alleged disability. (Doc. No. 34, at 13.) But this demands more of Mercer than the *McDonnell Douglas* framework requires. To establish the final element of a prima facie case of disability discrimination, Mercer need only provide evidence that she was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *See Gowesky*, 321 F.3d at 511. Mercer has provided evidence that Musick was selected for the Operations Manager position over her, and that Musick is not disabled. (Compl. ¶ 49; Doc. No. 29, at ¶ 49; Doc. No. 30, at ¶ 49.) This is sufficient—in the absence of a legitimate, nondiscriminatory reason for Mercer's demotion—for a jury to infer that ResCare and Foley were motivated by Mercer's alleged disability. *See Burdine*, 450 U.S. at 254 ("[T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'") (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

The summary judgment evidence also supports a prima facie case of disability discrimination regarding Mercer's lay-off in September 2010. As stated above, in reduction in force cases, the plaintiff must provide some evidence which would allow a jury to conclude that the "employer intended to discriminate in reaching the decision at issue." *Palasota*, 342 F.3d at 576. ResCare has provided evidence that Carlson noted Mercer's "inability to keep up with assignments and similar management issues"—job performance complaints that may have been related to her alleged disability—in connection with his and Foley's desire to take employment action against Mercer following her return from FMLA leave. (Doc. No. 57-1, at 29.) Although

the Court expresses reservations regarding the ultimate persuasiveness of this evidence, the threshold for a prima facie case is "extremely low." *Roy v. U.S. Dep't of Agri.*, 115 Fed. Appx. 198, 200 (5th Cir. 2004). Mercer has met it on both instances of adverse employment action against her.

### 2.      Legitimate, nondiscriminatory reason

ResCare's legitimate, nondiscriminatory reasons for demoting and then terminating Mercer in September 2010 are described above, in Section III(A)(2). As before, these suffice to meet ResCare's very low burden of production.

### 3.      Pretext

In accordance with the *McDonnell Douglas* framework, the burden shifts back to Mercer to produce sufficient evidence that ResCare's legitimate, nondiscriminatory reasons were pretext for disability discrimination. As stated in Section III(A)(3), Mercer has considerable evidence of pretext. Much of this evidence relates specifically to racial animus in the ResCare work environment. But other evidence simply undermines the truthfulness of ResCare's stated reasons. For example, the contradictory positions taken by ResCare and Foley in their descriptions of what happened in August and September 2010 are very strong evidence of pretext.

ResCare argues that the Court may grant summary judgment on a discrimination claim if the plaintiff has shown only a "weak" issue of fact. (Doc. No. 34, at 4.) This is based on the following pronouncement by the U.S. Supreme Court:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case

26

> and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Reeves*, 530 U.S. at 148. With some reservation, the Court does not at this point feel it appropriate to declare Mercer's evidence insufficient to reach a jury. ResCare may certainly move for judgment again at trial, where the Court's opinion may be better shaped by the evidence actually presented.

### C.     FMLA

Under the FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA protects an employee from interference with her leave. *See id.* § 2615(a)(1). It also obligates the employers, following the employee's return, to restore the employee to "the position of employment held by the employee when the leave commenced" or to "an equivalent position." *Id.* 2614(a)(1). Mercer brings a claim under the FMLA on both bases, alleging that ResCare both interfered with her right to take leave (the "FMLA Interference" claim), and that it failed to restore her to her prior position (the "FMLA Reinstatement" claim).

### 1.     FMLA Interference claim

To prevail on a cause of action for interference with FMLA rights, an employee must prove both that the employer interfered with, restrained, or denied his or her exercise of FMLA rights, and also that the employee was prejudiced by this violation. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Interference with FMLA rights can include "for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave" or "manipulation by a covered employer to avoid responsibilities under the FMLA." 29 C.F.R. §

27

825.220(b).

ResCare argues that Mercer cannot establish her FMLA Interference claim because it is undisputed that Mercer was granted FMLA leave. (Doc. No. 34, at 15.) But Mercer's claim is not that she was ultimately denied FMLA leave. Rather, Mercer claims that ResCare interfered with or discouraged her leave in the following ways: (1) refusing to permit her to begin leave when requested and requiring her to finish a recently assigned project (Doc. No. 41-3, at ¶ 27); (2) giving her work to complete at home during her leave (*id.*); and (3) refusing to allow her to return to work on time by insisting upon medical clearance from the same doctor who authorized her leave despite knowing that this doctor was unavailable at the time Mercer was scheduled to return to work (*id.* at ¶ 29).

Assuming that these allegations are sufficient to create a factual issue as to whether ResCare interfered with Mercer's FMLA rights, Mercer must additionally show a real impairment of her rights, and resulting prejudice, to prevail on her FMLA Interference claim. *Ragsdale*, 535 U.S. at 81; *Arismendiz v. Univ. of Tex. at El Paso*, 536 F.Supp.2d 710, 716 (W.D. Tex. 2008) (granting summary judgment on plaintiff's FMLA interference claim when "the undisputed facts and the evidence show that Plaintiff was not actually deterred from asking for FMLA leave and that she received all the FMLA leave that she sought"). Here, Mercer's allegations are clearly wanting. Even viewing the evidence in Mercer's favor, she simply has not articulated how her FMLA rights were impaired by Defendants' alleged actions. She requested, and was given, 12 weeks of FMLA leave. This is all she was entitled to receive by law. ResCare is entitled to summary judgment on Mercer's FMLA Interference Claim.

### 2.    FMLA Reinstatement claim

Mercer also alleges that ResCare failed to restore her to the Operations Manager position, as required by the FMLA. When an employee returns from FMLA leave, her employer has a duty to reinstate her to the same position she held before taking leave, or "'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (quoting 29 U.S.C. § 2614(a)(1)). An employer's failure to do so "gives rise to an entitlement claim under 29 U.S.C. § 2615(a)(1)." *McArdle v. Dell Prods., L.P.*, 293 Fed.Appx. 331, 334 (5th Cir. 2008).

ResCare argues that it is entitled to judgment on Mercer's FMLA Reinstatement claim because she was restored to the Operations Manager position following her leave. (Doc. No. 34, at 15-16.) But, as described above, the matter of Mercer's employment in August and September 2010 is strongly disputed by the parties. Mercer contends that she was pushed out of the Operations Manager position almost immediately upon her return.  Internal email circulated among ResCare management and human resources supports that this was the case. (Doc. No. 54-5, at 2; Doc. No. 55-4, at 6; Doc. No. 55-6, at 2; Doc. No. 52-1, at 3.) One human resources representative explicitly stated that Mercer could only be demoted if it was part of a disciplinary action begun before Mercer's leave. (Doc. No. 55-4, at 6.) It appears, however, that no such prior disciplinary action exists. (*Id*; Doc. No. 45-4, at 3.) A factual issue exists regarding whether ResCare reinstated Mercer to the Operations Manager position, rendering summary judgment on her FMLA Reinstatement claim inappropriate.

In its reply in support of its motion for summary judgment, ResCare suggests that Mercer's FMLA Reinstatement claim fails even if she was not restored to the Operations Manager position, because it is "undisputed that [Mercer] applied for and received the County

Supervisor position." (Doc. No. 57, at 15.) It is true that the law permits an employer to restore an employee who has returned from FMLA leave to an equivalent position that is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, prerequisites and status." 29 C.F.R. § 825.215(a). "It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id.* The Court has no trouble finding a fact issue regarding the equivalence of the Operations Manager and Rural County Supervisor positions. The evidence indicates that the latter entailed a reduction in pay; a loss of personal office space; more travel; and a step down in the corporate hierarchy. Any of these factors is sufficient to preclude summary judgment as to the equivalence of the positions.

### D.     Retaliation Claims

Title VII prohibits retaliation against employees for pursuing their statutory rights to be free of discrimination in the workplace. *See* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). The ADA and FMLA contain similar, anti-retaliation provisions. *See* 42 U.S.C. § 12203(a) (ADA); 29 U.S.C. § 2615(a)(2) (FMLA).

The *McDonnell Douglas* framework applies to retaliation claims as it does to discrimination claims. *Long v. Eastfield Coll.*, 88 F.3d 300, 304-05 (5th Cir. 1996). A plaintiff may establish a *prima facie* case of unlawful retaliation by demonstrating that: (1) she engaged in protected activity; (2) she suffered a materially adverse employment decision; and (3) a causal

link exists between the protected activity and the adverse employment decision.[14] *See Washburn v. Harvey*, 504 F.3d 505, 510 (5th Cir. 2007); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 11221-22 (5th Cir. 1998). Protected activity includes opposing an employment practice prohibited by Title VII, the ADA, or the FMLA—whether by making a charge of discrimination, or by testifying, assisting, or participating in an investigation or proceeding under any of these statutes. *Mota v. Univ. of Texas Houston Health Science Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001). It also includes taking leave under the FMLA. *See* 29 C.F.R. 825.220(c) ("The Act . . . prohibits an employer from discriminating or retaliating against an employee . . . for having exercised [FMLA rights].").

For purposes of discrimination claims, an "adverse employment decision" is limited to "'ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). In the retaliation context, however, the definition of "adverse employment decision" is broader. *Id*. at 559-60. The decision or action, while not necessarily "ultimate," must be "materially adverse" such that it would be "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts and their employers." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id*.

---

[14]  In the cases of FMLA retaliation claims, this final element may be established by demonstrating: (a) plaintiff was treated less favorably than an employee who did not request FMLA leave or (b) the adverse employment decision was made because of her request for leave. *Hunt*, 277 F.3d at 768.

### 1.    Prima facie case

ResCare claims that Mercer has no evidence that her demotion and lay-off were causally connected to any protected activity. (Doc. No. 34, at 17.) The Court finds that Mercer has adduced sufficient evidence to show a fact issue as to whether her demotion and lay-off were causally connected to her discrimination claim filed in April 2010 or her FMLA leave from May to August 2010. "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997). In Mercer's case, the events were not simply close in time, they were practically contemporaneous. The meeting on Mercer's discrimination claim occurred on April 22, 2010. (Doc. No. 41-3, at ¶ 24.) She requested FMLA leave three weeks later on May 12. (*Id*. at ¶ 27.) She returned to work on August 12, 2010. (Doc. No. 41-4, at ¶ 30.) As stated above, there is some evidence that Defendants began working to demote her almost immediately upon her return.

Additionally, Mercer does not rely on the suspicious timing alone. She also has identified numerous instances of alleged derogatory language and disparate treatment directed to her and other minority employees. She has testified that Foley directly threatened her job and criticized her for participating in other discrimination investigations. A former coworker reports hearing Foley say during Mercer's leave that she was not coming back to work and that she needed to be replaced. (Doc. No. 39-1, at ¶ 9.) This evidence, combined with the timing of the demotion and the lay-off, create a fact issue regarding whether ResCare unfairly retaliated against her for engaging in protected activity under Title VII and/or the FMLA.

The Court does not find that Mercer has alleged any factual basis for her retaliation claim under the ADA. Mercer has not identified any statutorily protected activity that she engaged in

under the ADA. For example, it does not appear that she ever requested and received a reasonable accommodation under the ADA, or that she ever raised herself or participated in another's disability discrimination claim. Therefore, the Court grants summary judgment to ResCare on Mercer's ADA retaliation claim.

### 2.    Legitimate, nondiscriminatory or non-retaliatory reason

ResCare's legitimate, non-retaliatory reasons for demoting and then terminating Mercer in September 2010 are described above, in Section III(A)(2). As before, these suffice to meet ResCare's very low burden of production.

### 3.    Pretext

For the reasons stated above, in Section III(A)(3), Mercer has provided ample evidence of pretext regarding ResCare's legitimate, non-retaliatory reasons for demoting and terminating her. Therefore, ResCare is not entitled to summary judgment on Mercer's Title VII and FMLA retaliation claims.

### E.    Assault and Battery

Mercer also asserts an assault and battery claim against Defendants, based upon Foley's treatment of her which she claims caused her to fear physical reprisal from him. (Compl. ¶¶ 81-83.) Mercer highlights several encounters with Foley on which she bases her assault claim. One of these "assaults" occurred during her April 22, 2010 meeting with Dawson and Foley, during which Foley allegedly leaned across the table towards Mercer and screamed that he would not stop yelling at her. (Doc. No. 41-3, at ¶ 25.) Another occurred when Foley asked a coworker where Mercer's mother lived.[15] (Doc. No. 42-4, at 3.) Another occurred when Foley expressed hope that Mercer would stop taking her blood pressure medication, which could cause her to

---

[15] Mercer allegedly interpreted this question to be an implicit threat against her mother. (Doc. No. 42-1, at 3.)

have an accident so that "[w]e don't have to worry about you anymore." (*Id.*) Another occurred when Foley accused her of reporting him to TWC and the BVWS Board and threatened to "plant stones" for her at work. (Doc. No. 41-4, at ¶ 40.)

Defendants argue that Mercer's assault claim fails because she has no evidence that "Foley threatened her with imminent bodily injury or that she has any recoverable damages." (Doc. No. 34, at 21.) The Court need not reach Defendants' second argument, as it finds the first to be adequate to resolve the issue. It is undisputed that Foley did not cause Mercer bodily injury or physical contact that he should have known or believed she would regard as offensive or provocative. Therefore, to avoid summary judgment on her claim, Mercer is required to produce evidence that Foley "intentionally or knowingly threatened [her] with imminent bodily injury." *See Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 439 (Tex. App.—Fort Worth 2009, pet. denied). Mercer has provided no evidence that Foley threatened her with any bodily injury, imminent or otherwise. Defendants are entitled to summary judgment on this claim.

## IV.    OBJECTIONS AND MOTION TO STRIKE

Defendants object to, and move to strike, portions of five affidavits and one deposition transcript submitted by Mercer in opposition to Defendants' motion for summary judgment. (Doc. No. 56.) The Court will address only those objections to evidence relied upon in this order; all remaining objections are overruled as moot.

- <u>Exhibit A</u> (Clark affidavit): Defendants object that paragraph seven of Clark's affidavit "lacks foundation and is conclusory." (Doc. No. 56, at 3.) The portion relied upon by the Court is not conclusory. Additionally, Clark explained that he worked under Mercer, as a TWC employee, beginning in February 2009. (Doc. No. 39-1, ¶¶ 2-3.) This provides an adequate foundation for Clark's testimony regarding a statement allegedly made by Foley at the job site.

- <u>Exhibit E</u> (Williams affidavit): Defendants object that the affidavit was not timely produced by the close of discovery. (Doc. No. 56, at 4.) But affidavits in support of an opposition to summary judgment need not be exchanged as part of the

34

discovery process. Defendants also object that paragraph 26 lacks foundation and is conclusory. (*Id*. at 5.) The Court finds that Williams' years of employment in the BVWS office, along with her relatively high position in the office, provide foundation for her testimony, which is not conclusory. (Doc. No. 39-3, at ¶¶ 2, 5.)

- <u>Exhibit G</u> (Lopez affidavit): Defendants object that the affidavit was not exchanged during discovery. As stated above, there was no requirement to do so. Defendants also object that paragraph 24 lacks foundation and is conclusory. (Doc. No. 56, at 7.) The Court finds that Lopez's years of employment in the BVWS office, along with her relatively high position in the office, provide foundation for her testimony, which is not conclusory. (Doc. No. 39-4, at ¶¶ 2, 5.) Defendants also object that paragraph 25 lacks foundation and is conclusory. (Doc. No. 56, at 7.) The Court finds that Lopez's position as financial aid specialist provides foundation for her testimony, which is not conclusory. (Doc. No. 39-4, at ¶¶ 5, 25.)

- <u>Exhibit H</u> (Mercer affidavit): Defendants object that the affidavit was not exchanged during discovery. (Doc. No. 56, at 7.) As stated above, there was no requirement to do so. Defendants also allege that paragraphs 12, 18, 46, and 47 lack foundation and are conclusory. (*Id*. at 8-9.) The Court finds that Mercer's years of employment in the BVWS office, along with her high position in the office, provide foundation for her testimony, which is not conclusory. (Doc. No. 41-2, at ¶¶ 3, 6.) Defendants also object that paragraphs 22, 43, and 44 contain hearsay. (*Id*. at 8-9.) Although these paragraphs contain out-of-court statements, none of the statements is offered for the truth of the matter asserted and therefore none constitute hearsay. FED. R. EVID. 801(c)(2). Finally, Defendants object that paragraph 48—in which Mercer describes the limitations she faces due to her anxiety and other physical ailments—is a medical opinion that Mercer is not qualified to render. The Court disagrees that this testimony is a medical opinion.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' objections to Mercer's summary judgment evidence are **OVERRULED**, and Defendants' Motion to Strike (Doc. No. 56) is **DENIED**. Furthermore, Defendants' Motion for Summary Judgment (Doc. No. 34) is **GRANTED IN PART** and **DENIED IN PART**. The Court finds that: (1) ResCare is entitled to summary judgment on Mercer's retaliation claim under the ADA; FMLA Interference claim; and assault and battery claim, and that (2) Foley is entitled to summary judgment on Mercer's assault and battery claim. As to Mercer's race, sex, and disability discrimination claims; FMLA Reinstatement claim; and Title VII and FMLA retaliation claims against ResCare, summary judgment is denied.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 15th day of January, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE